JUSTICE HOOD delivered the Opinion of the Court.
¶1 Inside defendant Kevin McKnight's truck, police officers discovered a pipe containing what later proved to be methamphetamine residue. That discovery culminated in McKnight's conviction for certain drug offenses. On appeal, he challenged the constitutionality of the search that revealed the pipe.
¶2 A division of the court of appeals reversed McKnight's convictions. People v. McKnight , 2017 COA 93, ¶ 25, --- P.3d ----. Each member of the division wrote separately, wrestling with what effect, if any, legalized marijuana in Colorado should have on the constitutionality of the search of McKnight's truck. To which you might say, but this is a methamphetamine case. So, why are we talking about marijuana? Well, the drug-detection dog used to find the pipe, Kilo, was trained to alert on multiple drugs, including marijuana. Even a hint of marijuana can trigger the same response from Kilo as any quantity of methamphetamine.
¶3 And that's where things get tricky. After all, the possession of an ounce or less of marijuana by someone twenty-one or older is legal in Colorado, following the passage of Amendment 64, Colo. Const. art. XVIII, § 16 (3), even though such possession remains illegal under federal law. Thus, no matter how reliable his nose, Kilo can now render a kind of false positive for marijuana. He has been trained to alert to marijuana based on the notion that marijuana is always contraband, when that is no longer true under state law. And historically, whether a drug-detection dog might alert on noncontraband drives whether the dog's sniff constitutes a search implicating constitutional protections. The dog's sniff arguably intrudes on a person's reasonable expectation of privacy in lawful activity. If so, that intrusion must be justified by some degree of particularized suspicion of criminal activity.
¶4 Does this mean that Amendment 64 gave McKnight a reasonable expectation of privacy under either the federal or state constitution that was violated by Kilo's keen sense of smell? McKnight says yes. Among other things, he claims that the Colorado Constitution prohibited Kilo's intrusion without at least reasonable suspicion that McKnight had committed or was committing a crime. Because there was none, McKnight asserts that the trial court should have suppressed the pipe. Two members of the division agreed. McKnight , ¶ 3.
¶5 And even if the "sniff [was] up to snuff" (to use Justice Kagan's popular shorthand from a slightly different context in Florida v. Harris , 568 U.S. 237, 248, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) ), McKnight further argued that there was no probable cause for the post-sniff hand search of his truck that revealed the pipe. Again, because of Amendment 64, two members of the division agreed. McKnight , ¶ 4.
¶6 The People counter that, despite Amendment 64, marijuana remains contraband in many circumstances at the state level, and illegal under all circumstances federally, and thus Kilo's sniff was not a search requiring so much as reasonable suspicion. The People further contend that an alert from a dog trained to detect marijuana, in *400 addition to other substances, still provides probable cause justifying a search.
¶7 We hold that a sniff from a drug-detection dog that is trained to alert to marijuana constitutes a search under article II, section 7 of the Colorado Constitution because that sniff can detect lawful activity, namely the legal possession of up to one ounce of marijuana by adults twenty-one and older. We further hold that, in Colorado, law enforcement officers must have probable cause to believe that an item or area contains a drug in violation of state law before deploying a drug-detection dog that alerts to marijuana for an exploratory sniff. Because there was no such probable cause justifying Kilo's search of McKnight's truck, the trial court erred in denying McKnight's motion to suppress.
¶8 Accordingly, we affirm the judgment of the court of appeals.
I. Facts and Procedural History
¶9 Evidence presented at a suppression hearing established the following facts.
¶10 While on patrol in an unmarked police vehicle one night in February 2015, Craig Police Officer Bryan Gonzales observed a parked pickup truck facing the wrong way in a one-way alley near an apartment complex. A man stood outside of the passenger-side door of the truck. Although Officer Gonzales saw no behavior consistent with an exchange or transaction, he followed the truck as it traveled a few blocks. The truck then parked in front of a residence where police had found drugs almost two months earlier, and it remained parked there for approximately fifteen minutes. During that time, no one exited the truck or the residence. When the truck started moving again, Gonzales trailed along.
¶11 When the driver of the truck failed to signal a turn, Gonzales pulled the truck over. He discovered that McKnight was the driver. And Gonzales recognized the passenger as someone who had used methamphetamine "at some point in the past," but he wasn't sure how recently.
¶12 During the traffic stop, Gonzales asked Sergeant Courtland Folks of the Moffat County Sheriff's Office to respond with his drug-detection dog, Kilo, who had been trained to detect the odors of marijuana, methamphetamine, cocaine, heroin, and ecstasy. If Kilo detects the scent of any one of those substances, he should alert. And he exhibits the same alert for all five drugs.
¶13 Within five minutes of the stop, Kilo was on the job. As Folks walked Kilo around McKnight's truck, Folks asked McKnight if he had "any narcotics on him." McKnight said no. Kilo quickly "alerted" on the driver's door beneath the driver's open window. This means that Kilo engaged in a rapid sniffing pattern and behaved in a manner suggesting the presence of one of the substances on which he had been trained. According to Folks, Kilo then "put his nose on the driver's door, back to the door handle, did a purge, which means he cleared his nose, took another deep breath and immediately started giving a trained indication, which was barking."
¶14 The officers then ordered McKnight and the passenger to exit the truck. After they complied, the officers patted them down and found nothing on them. The officers then searched the truck by hand. In a storage compartment under the rear seat, they found a pipe containing suspected methamphetamine residue.
¶15 Before trial, the defense moved to suppress the pipe, arguing that it was the fruit of an unconstitutional search. Specifically, McKnight argued that because marijuana is legal in Colorado and Kilo was trained to detect marijuana, Kilo's sniff was a search that required particularized suspicion of criminal activity before Kilo could be deployed, and there was no such suspicion on these facts. Moreover, he contended that Kilo's alert did not provide probable cause for a full-blown, human search of the truck. Through counsel, McKnight grounded his arguments in the search and seizure clauses of both the United States and Colorado Constitutions.
¶16 After a hearing, the trial court denied the motion to suppress. In relevant part, the trial court noted that the possession of marijuana remains illegal under many circumstances in Colorado and is categorically illegal *401 under federal law. Without explicitly stating as much, the trial court seemed to reason that a sniff by a dog trained to detect marijuana does not constitute a search. And even if Kilo's sniff was a search, the trial court went on to conclude that there was reasonable suspicion of criminal activity supporting the search. With ample record support, the court also concluded that Kilo reliably sniffs out the drugs on which he's been trained. The trial court did not address whether there was probable cause for the officers' hand search of the truck.
¶17 A jury later convicted McKnight of possession of a controlled substance and possession of drug paraphernalia.
¶18 McKnight appealed. In three separate but partially overlapping opinions, the court of appeals unanimously agreed that the trial court erred in denying McKnight's motion to suppress the pipe and that the error was not harmless. Therefore, the division reversed McKnight's convictions.
• Judge Dailey, writing for himself and Judge Berger, agreed with McKnight that, under the Colorado Constitution after the enactment of Amendment 64, Kilo's sniff was a search requiring reasonable suspicion of criminal activity. McKnight , ¶ 18 ("Because a dog sniff of a vehicle could infringe upon a legitimate expectation of privacy solely under state law, that dog sniff should now be considered a 'search' for purposes of article II section 7 of the state constitution where the occupants are twenty-one years or older."). Judge Dailey further determined that the reasonable suspicion standard should govern, and he concluded that the totality of the circumstances did not give the police reasonable suspicion that McKnight had engaged in criminal activity. Id. at ¶¶ 19-20, 22-24.
• Judge Jones, writing for himself and Judge Berger, agreed with McKnight that Kilo's alert, even in combination with other circumstances, did not give the police probable cause to conduct a warrantless hand search of McKnight's truck. Id. at ¶¶ 49-54 (Jones, J., specially concurring). In doing so, Judge Jones sidestepped the issue of whether Kilo's sniff now constitutes a search under state law. Id. at ¶ 37.
• Judge Berger, writing for himself, explained how a person could have an enforceable expectation of privacy in the possession of marijuana under state law, even in the face of a federal prohibition. First, he noted that Colorado courts must give effect to Colorado voters' enactment of Amendment 64. Id. at ¶ 29 (Berger, J., specially concurring). Second, he observed that the People have not argued that Amendment 64 is preempted by federal law. Id. Finally, he concluded that when Amendment 64 legalized possession of up to one ounce of marijuana for personal use by persons twenty-one years of age or older, it also limited police authority to enforce the federal prohibition. Id. at ¶ 31.
¶19 The People filed a petition for a writ of certiorari, and we agreed to review the case.[1]
II. Analysis
¶20 After identifying the standard of review, we examine the parallel evolution of federal and state jurisprudence concerning police use of drug-detection dogs. We review long-standing law reasoning that a sniff is not a search because an individual has no legitimate expectation of privacy as to contraband. But after the passage of Amendment 64, possession of an ounce or less of marijuana by someone twenty-one or older is legal, and thus, marijuana is no longer always "contraband" under state law. Because Kilo's sniff could detect lawful activity, we conclude his sniff was a search under the Colorado Constitution. We then consider *402 what level of suspicion would justify deploying such a dog to sniff a vehicle, ultimately concluding that, because the sniff is a search, there must be probable cause to believe a vehicle contains illegal narcotics under state law before deploying a drug-detection dog trained to alert to marijuana. We conclude that, under the totality of the circumstances, there was no probable cause justifying the use of Kilo to sniff McKnight's truck or the subsequent hand search of the truck, and, exclusion of the pipe is the appropriate remedy for this violation of the Colorado Constitution.
A. Standard of Review
¶21 When reviewing a suppression order, we defer to the trial court's factual findings if the record supports them, but we review de novo the court's legal conclusions. Grassi v. People , 2014 CO 12, ¶ 11, 320 P.3d 332, 335. So, we address the constitutionality of Kilo's sniff and the subsequent hand search of the truck de novo.
B. Federal Law Governing Searches and Drug-Detection Dogs
¶22 The Fourth Amendment to the United States Constitution states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
It "protects people, not places" from unreasonable governmental searches and seizures. Katz v. United States , 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ; see also U.S. Const. amend. IV. A search in the constitutional sense occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States , 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (citing Katz , 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring)).
¶23 "Warrantless searches are presumptively unreasonable," and thus unconstitutional, unless an exception to the warrant requirement exists. United States v. Karo , 468 U.S. 705, 717, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984). Courts measure the constitutionality of a search (either pursuant to a warrant or warrantless) at the time a search is performed. The Fourth Amendment does not favor post hoc justifications based on what was found during a search. See, e.g. , People v. Sotelo , 2014 CO 74, 336 P.3d 188 ("[C]ourts may not use the benefit of hindsight in evaluating application of the Fourth Amendment."); see also California v. Acevedo , 500 U.S. 565, 599, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (Stevens, J., dissenting) ("Neither evidence uncovered in the course of a search nor the scope of the search conducted can be used to provide post hoc justification for a search unsupported by probable cause at its inception."); United States v. Montoya de Hernandez , 473 U.S. 531, 559, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (Brennan, J., dissenting) ("[P]ost hoc rationalizations have no place in our Fourth Amendment jurisprudence, which demands that we 'prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure.' " (quoting United States v. Martinez-Fuerta , 428 U.S. 543, 565, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) )).
¶24 A warrantless search may be constitutional if there was probable cause to believe the place or item to be searched contained contraband or evidence of a crime, and the circumstances met an exception to the warrant requirement. One such exception is the automobile exception. Beginning with Carroll v. United States , the Supreme Court has reasoned that automobiles warrant a lesser degree of privacy than that afforded to homes because of a vehicle's "ready" mobility, the existing, pervasive government regulation of cars, and the low probability that a car is used to store personal effects. See 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (reasoning that there is "a necessary difference between a search of a store, dwelling house, or other structure ... [where] a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile ... where it is not practicable to secure a warrant, because the *403 vehicle can be quickly moved"). Nearly a century later, the law remains the same: If an officer has lawfully stopped a vehicle, and has probable cause to believe the vehicle contains evidence of a crime, then the officer may conduct a search of the car without first obtaining a warrant. Collins v. Virginia , --- U.S. ----, 138 S. Ct. 1663, 1670, 201 L.Ed.2d 9 (2018).
¶25 As the Supreme Court continued to embrace and refine the automobile exception, drug-detection dogs scampered on to the scene. United States v. Place marked the Supreme Court's first foray into this area of the law. 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In Place , two law enforcement officers grew suspicious that Place might be carrying narcotics after observing him at Miami International Airport. Id. at 698, 103 S.Ct. 2637. The officers remained suspicious after talking with the defendant, though they ultimately decided not to search his luggage. Id. The officers looked closely at the luggage tags on the defendant's checked bags and noticed discrepancies between the two addresses and the phone number the defendant gave the airline. Id. The officers notified law enforcement agents in New York of the defendant's impending arrival. Id. Two Drug Enforcement Administration agents contacted the defendant when he landed, informed the defendant that they believed he may be transporting illegal narcotics, and ultimately seized his luggage in order to subject it to a sniff from a drug-detection dog. Id. at 698-99, 103 S.Ct. 2637.
¶26 Though Place turned on whether the seizure of the defendant's luggage without probable cause violated the Fourth Amendment, the Court discussed the use of drug-detection dogs at airports to sniff luggage suspected of containing illegal narcotics. See id. at 707, 103 S.Ct. 2637. The Court reasoned that exposing "temporarily detain[ed] personal luggage" to a dog trained to detect narcotics wasn't a search under the Fourth Amendment. Id. at 697-98, 103 S.Ct. 2637. The sniff is "sui generis," stated the Court, because it is less intrusive than other search techniques and it can only reveal the "presence or absence of narcotics, a contraband item." Id. at 707, 103 S.Ct. 2637. The Court's rationale thus hinged on two notions: (1) A dog sniff is a minimally intrusive tactic (2) that can only reveal whether or not contraband is present in the luggage. Beyond that, the sniff reveals nothing. Despite the narrow circumstances in which the Court made these statements, they have formed the foundation for much federal (and state) jurisprudence on dog sniffs.
¶27 The Supreme Court relied on this reasoning in Illinois v. Caballes to conclude that "the use of a well-trained narcotics-detection dog-one that 'does not expose noncontraband items that otherwise would remain hidden from public view'-during a lawful traffic stop, generally does not implicate legitimate privacy interests." 543 U.S. 405, 409, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (internal citation omitted) (quoting Place , 462 U.S. at 707, 103 S.Ct. 2637 ). In Caballes , an officer led a drug-detection dog around a vehicle that was lawfully stopped for speeding. Id. at 406, 125 S.Ct. 834. The dog alerted at the trunk, leading to a search that revealed marijuana. Id. Looking back to Place , the Court rejected the claim that the dog sniff was unconstitutional because there was no reasonable suspicion that the defendant possessed narcotics when he was initially stopped. Id. at 408-09, 125 S.Ct. 834. Notably, the Court didn't focus on how the officers in Place had already grown suspicious that the defendant was engaged in illegal narcotics activity before stopping and contacting the defendant. Compare id. , with Place , 462 U.S. at 698-700, 103 S.Ct. 2637. Instead, the Court reasoned that reasonable suspicion wasn't necessary to justify the dog sniff because it could only detect contraband, and "any interest in possessing contraband cannot be deemed 'legitimate,' ... thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.' " Id. at 408, 125 S.Ct. 834 (quoting United States v. Jacobsen , 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ).[2]
*404 C. Colorado Law: Pre-Amendment 64
¶28 Our search and seizure jurisprudence took a different path. In decades past, our opinions demonstrated a willingness to interpret the state constitution to afford broader protections than its federal counterpart. Yet, in recent years, we have moved away from this interpretive independence.
¶29 Article II, section 7 of the Colorado Constitution states:
The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.
¶30 In Charnes v. DiGiacomo , this court first charted its own course in interpreting article II, section 7 to afford broader protections than the Fourth Amendment. 200 Colo. 94, 612 P.2d 1117 (1980). Charnes concerned a taxpayer's challenge to a subpoena issued to his bank by the Colorado Department of Revenue seeking the taxpayer's financial records. Id. at 1119. Applying United States v. Miller , this court concluded that the Fourth Amendment did not shield the taxpayer's financial records from government seizure because the taxpayer could not claim any expectation of privacy in the information he shared with his bank through financial transactions. Id. at 1120 (citing 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) ). But, the analysis did not end there. We then looked to article II, section 7 and concluded that the analytical framework announced in Katz -whether the defendant had a subjective expectation of privacy in his bank records that society was prepared to recognize as reasonable-was also the framework to be applied under the Colorado Constitution. See id. at 1120-21. Noting that Miller "does not determine the scope of protection provided to individuals in Colorado by the constitution of this state," we concluded that, under the Colorado Constitution, bank depositors have a reasonable expectation of privacy in records concerning their financial transactions held at banks in Colorado. Id. Charnes was only the first in a series of cases holding that article II, section 7 provides greater privacy protections than the Fourth Amendment. See, e.g. , People v. Sporleder , 666 P.2d 135, 143-44 (Colo. 1983) (rejecting the U.S. Supreme Court's reasoning in Smith v. Maryland , 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), to hold that the installation and use of a pen register constitutes a search under state law); People v. Corr , 682 P.2d 20, 27-28 (Colo. 1984) (applying the reasoning of Sporleder to conclude that a warrant is required to obtain telephone toll records); People v. Oates , 698 P.2d 811, 815-16 (Colo. 1985) (rejecting the reasoning of Karo , 468 U.S. 705, 104 S.Ct. 3296, and holding that the installation and presence of a tracking device in purchased commercial goods constitutes a search under the Colorado Constitution).
¶31 In People v. Unruh , we considered the constitutional permissibility of a dog sniff of a locked safe. 713 P.2d 370, 378-79 (Colo. 1986), abrogated by People v. Esparza , 2012 CO 22, 272 P.3d 367. We concluded that, despite the less intrusive nature of a dog sniff, it was a search because the defendant had a reasonable expectation of privacy in the locked safe. Id. In coming to this conclusion, we distinguished Place , noting that the sniff of a person's luggage at an airport was not deemed a search because the person has "no reasonable expectation of privacy from an investigative technique as non-intrusive as a dog sniff" at the airport. Id. at 378. We then had to decide whether a warrant was necessary to deploy the drug-detection dog, or whether "something less than probable cause" could justify the sniff. Id. We looked to Terry v. Ohio , 392 U.S. 1, 30-31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where the U.S. Supreme Court held that an officer may conduct a stop if he has reasonable suspicion criminal activity is occurring. We analogized *405 an exploratory dog sniff to the brief investigatory stops at issue in Terry , and we concluded that the proper "balance between governmental and individual interests in this case" necessitated that there be reasonable suspicion to justify the exploratory sniff. Unruh , 713 P.2d at 379. Our reasoning rested primarily on two principles: (1) the defendant had a reasonable expectation of privacy in the item searched (his locked safe), and (2) a dog sniff, though a search, was a less intrusive search than a traditional search by hand. Id. at 377-79.
¶32 In People v. Haley , we applied the reasoning of Unruh to conclude that a dog sniff resulting from an impermissibly prolonged traffic stop violated the protections of article II, section 7.[3] 41 P.3d 666, 673-74, 676-77 (Colo. 2001), abrogated by Esparza , 2012 CO 22, 272 P.3d 367. This was so because the defendants had "a privacy interest in their persons and vehicle being free from unreasonable governmental intrusion, and the drug investigation following the traffic stop in this case required reasonable suspicion for the dog sniff search to proceed." Id. at 674. We acknowledged that "automobiles enjoy a lesser expectation of privacy in our society than private homes," but we also noted that "citizens have a reasonable expectation of privacy from search and seizure in their cars and in their persons as they travel the state's roads." Id. at 672 (citing New York v. Class , 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) ("A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile.")).
¶33 However, in People v. Esparza , we reviewed our prior precedent on dog sniffs and, in doing so, narrowed its scope. 2012 CO 22, 272 P.3d 367. We concluded that, "[d]espite our broad language purporting to address dog sniffs in general," our earlier decisions suggested a "more limited rule" was appropriate. Id. at ¶ 9, 272 P.3d at 369. Specifically, we noted that our dog-sniff jurisprudence has "been concerned with the nature of the particular container being pursued and any official conduct making it possible for a trained drug dog to sniff the container in the first place." Id. at ¶ 8, 272 P.3d at 369. Ultimately, we held "that an interest in possessing contraband cannot be deemed legitimate under the state constitution any more than under the federal constitution, and that official conduct failing to compromise any legitimate interest in privacy cannot be deemed a search under the state constitution any more than under the federal constitution." Id. at ¶ 2, 272 P.3d at 368. Like the U.S. Supreme Court, we based our holding in part on the purportedly binary nature of the dog's sniff. The sniff, we reasoned, could only communicate either the presence or absence of contraband. Id. at ¶ 11, 272 P.3d at 370.
¶34 Esparza thus represented a kind of return to the federal fold. The state of the law was thus: (1) under the automobile exception, an officer may search a car without a warrant if that officer has probable cause to believe there is contraband in the car; (2) an officer doesn't need reasonable suspicion to walk a drug-detection dog around a lawfully stopped vehicle because the alert indicates only the presence of contraband, and people do not have a legitimate expectation of privacy in contraband; and (3) an alert from a drug-detection dog could provide probable cause for a subsequent hand search of the car. See id. at ¶¶ 10-12, 272 P.3d at 370 ; see also People v. Mason , 2013 CO 32, ¶ 10, 310 P.3d 1003, 1005 ("It is now settled that walking a trained narcotics detection dog around a car that has not been unlawfully stopped or detained does not implicate the protections of either the Fourth Amendment or Article II, section 7 of the state constitution."). And so it has been for the better part of a decade.
D. Colorado Law: Post-Amendment 64
¶35 Has the passage of Amendment 64 altered this settled terrain? We began to explore this question in our recent decisions in People v. Zuniga , 2016 CO 52, 372 P.3d 1052, and People v. Cox , 2017 CO 8, 401 P.3d 509. In both Zuniga and Cox , we found probable cause supporting an automobile search based on a confluence of factors, including the positive alert of a drug-detection dog that was trained to alert to marijuana. Yet, in Zuniga , we concluded that the alert was *406 legally ambiguous because a drug-detection dog can't distinguish legal marijuana from illegal marijuana, or legal marijuana from illegal narcotics. See ¶¶ 18-23, 372 P.3d at 1057-59. Despite this ambiguity, we held that the alert was still relevant to the overall probable cause analysis. Id. Likewise in Cox , we concluded that the positive alert of a drug-detection dog was one factor, among many, supporting a finding of probable cause to search a stopped vehicle. ¶ 17, 401 P.3d at 512-13.
¶36 In both Zuniga and Cox , we declined to address (1) whether the sniff of a dog trained to detect marijuana was a search, and (2) whether a positive alert from a dog trained to detect marijuana alone could establish probable cause. Significantly however, these two recent decisions suggest the answer to the latter question is no. We acknowledged that, with the legalization of small amounts of marijuana, a dog's alert doesn't provide a yes-or-no answer to the question of whether illegal narcotics are present in a vehicle. At most, the alert could be "suggestive of criminality," but not determinative on its own. See Zuniga , ¶ 23, 372 P.3d at 1059. Had the alert alone sufficed, there would have been no need to evaluate other circumstances in either Zuniga or Cox . Yet, we did just that. Thus, in finding that an alert from a drug-detection dog trained to find marijuana is ambiguous, Zuniga and Cox represent a tentative step away from the federal approach. See, e.g. , Harris , 568 U.S. at 240, 247-48, 133 S.Ct. 1050 (concluding that an alert from a well-trained, reliable drug-detection dog could supply probable cause to search a vehicle).
¶37 To be sure, marijuana remains illegal under federal law. The Federal Controlled Substances Act prohibits the possession of marijuana for nearly all uses. 21 U.S.C. § 812(c)(10) (2012) ; 21 U.S.C. § 812(b)(1)(A)-(C) (2012) ; 21 U.S.C. § 844(a) (2012). "There is no exception for marijuana use for medical purposes, nor is there an exception for use in compliance with state law." People v. Crouse , 2017 CO 5, ¶ 11, 388 P.3d 39, 42 (citing Gonzales v. Raich , 545 U.S. 1, 14, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) ). Consequently, marijuana remains contraband under federal law and, arguably, Kilo's sniff was not a search under the U.S. Supreme Court's interpretation of the Fourth Amendment in Caballes .[4] See McKnight , ¶ 18 n.4. This, however, leaves unanswered the question of whether Kilo's sniff was nonetheless a search under the corresponding provisions of our state constitution.[5]
¶38 We have opined that, despite the substantial similarity between article II, section 7 and the Fourth Amendment, "we are not bound by the United States Supreme Court's interpretation of the Fourth Amendment when determining the scope of state constitutional protections." Sporleder , 666 P.2d at 140. "There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed in the same way." Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 174 (2018); see also *407 Thompson v. Dallas City Attorney's Office , 913 F.3d 464, 471 (5th Cir. 2019) ("Our Nation boasts not one Constitution but 51, meaning American constitutionalism concerns far more than what began in Philadelphia 232 years ago." (citing Sutton, supra )). Indeed, the U.S. Supreme Court has a long tradition of encouraging us to scrutinize our own state constitutional texts, declaring: "It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." Minnesota v. Nat'l Tea Co. , 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940) ; see also Cooper v. California , 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) ("Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so."); Massachusetts v. Upton , 466 U.S. 727, 739, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (Stevens, J., concurring) ("The States in our federal system ... remain the primary guardian of the liberty of the people."); California v. Greenwood , 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) ("Individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."). Thus, state courts need not interpret state constitutional provisions "as mere mirrors of federal protections." Developments in the Law-The Interpretation of State Constitutional Rights , 95 Harv. L. Rev. 1324, 1356 (1982) ; see also William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights , 90 Harv. L. Rev. 489, 491 (1977) ("State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law.").
¶39 And, because the protections afforded by both article II, section 7 and the Fourth Amendment are "highly generalized," we discern no reason to reflexively assume that there must be "just one meaning over a range of differently situated sovereigns." Sutton, supra , at 174. Criminal law has traditionally been considered best left to the expertise of the state courts as the vast majority of criminal prosecutions take place in state, rather than federal, court. See Shirley S. Abrahamson, Criminal Law and State Constitutions: The Emergence of State Constitutional Law , 63 Tex. L. Rev. 1141, 1150 (1985) ("Criminal law is an area of traditional concern for state judges. It is an area of law in which state judges have special experience and expertise."); see also Tafflin v. Levitt , 493 U.S. 455, 465, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (reasoning, in part, that state courts can exercise concurrent jurisdiction over civil RICO cases because these cases "involve asserted violations of state law ... over which state courts presumably have greater expertise").
¶40 Moreover, we are confronted with a local development that further suggests resolution under our state constitution is proper. "State courts ... have a freer hand in doing something the Supreme Court cannot: allowing local conditions and traditions to affect their interpretation of a constitutional guarantee and the remedies imposed to implement that guarantee." Sutton, supra , at 17. When there are "general institutional differences between the state government and its federal counterpart" or "distinctive state-specific factors," including the existence of state constitutional provisions that provide rights not guaranteed by the federal constitution, interpreting the state constitution in a manner that departs from federal courts' interpretations of similar federal provisions not only makes sense, it may be the most logical option. See Developments in the Law , supra , at 1359-60.
¶41 Here, we have a state constitutional right not guaranteed by the federal constitution. Amendment 64 provides that it is "not unlawful and shall not be an offense under Colorado law" for a person who is at least twenty-one years of age to possess one ounce or less of marijuana. Colo. Const. art. XVIII, § 16 (3); see also Zuniga , ¶ 18, 372 P.3d at 1057. Amendment 64 was enacted through the initiative process in 2012, and its passage represents voters' intent to legalize marijuana use, possession, and growth under certain circumstances. Colo. Const. art. XVIII, § 16 (1)(a) (designating the purpose of Amendment 64 as "the people of the state of Colorado find and declare that the use of marijuana should be legal for persons twenty-one *408 years of age or older and taxed in a manner similar to alcohol"). "Our goal in interpreting a citizen initiative is to 'give effect to the electorate's intent.' " People v. Lente , 2017 CO 74, ¶ 16, 406 P.3d 829, 832 (quoting Colo. Ethics Watch v. Senate Majority Fund, LLC , 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253 ); see also Commonwealth v. Craan , 469 Mass. 24, 13 N.E.3d 569, 577-78 (2014) (discussing the importance of implementing the people's intent when examining the impact of a citizen initiative decriminalizing possession of small amounts of marijuana under state law on the probable cause analysis). Tellingly, Amendment 64 did more than just legalize personal marijuana use, possession, and growth. The initiative also created a marijuana industry. See Colo. Const. art. XVIII, § 16 (4). And, Amendment 64 reflects a desire to protect "individual privacy" by specifying that the Department of Revenue "shall not require" individual consumers to provide any information beyond a government-issued form of ID for age verification when purchasing marijuana at a retail marijuana store. Id. § 16 (5)(c).
¶42 Marijuana is not only decriminalized in Colorado, it is legalized, regulated, and taxed. Marijuana is now treated like guns, alcohol, and tobacco-while possession of these items is lawful under some circumstances, it remains unlawful under others. See, e.g. , § 18-12-103, C.R.S. (2018) (making it unlawful to knowingly possess a firearm without its serial number or other identifying mark); § 18-13-122(3)(a), C.R.S. (2018) (making it unlawful for persons under twenty-one to possess or consume alcohol); § 18-13-121, C.R.S. (2018) (making it unlawful to sell tobacco products to persons under eighteen). Although possession of guns, alcohol, and tobacco can be unlawful, persons still maintain an expectation of privacy in lawfully using or consuming those items. The same now goes for marijuana: In legalizing marijuana for adults twenty-one and older, Amendment 64 expanded the protections of article II, section 7 to provide a reasonable expectation of privacy to engage in the lawful activity of possessing marijuana in Colorado.
¶43 So, the rationale underlying Esparza no longer holds true when applied to Kilo's formidable nose. Because persons twenty-one or older may lawfully possess marijuana in small amounts, a drug-detection dog that alerts to even the slightest amount of marijuana can no longer be said to detect "only" contraband. Thus, an exploratory sniff of a car from a dog trained to alert to a substance that may be lawfully possessed violates a person's reasonable expectation of privacy in lawfully possessing that item. Because there was no way to know whether Kilo was alerting to lawful marijuana or unlawful contraband, Kilo's sniff violated McKnight's reasonable expectation of privacy. Therefore, under state law, Kilo's sniff was a search that had to be constitutionally justified.
¶44 Kilo's sniff now seems more akin to the "sense-enhancing" technology at issue in Kyllo . See 533 U.S. at 30, 121 S.Ct. 2038. There, the U.S. Supreme Court held that the use of a thermal-imaging device that was not used by the general public was a search because it could reveal private, lawful activity occurring inside of a home. Id. at 40, 121 S.Ct. 2038. With the device, law enforcement could "explore details ... that would previously have been unknowable without physical intrusion." Id. Though the U.S. Supreme Court focused its holding in part on the fact that the device was used on the home, Kyllo 's central rationale is instructive because "citizens [still] have a reasonable expectation of privacy from search and seizure in their cars and in their persons as they travel the state's roads." Haley , 41 P.3d at 672 ; accord Caballes , 543 U.S. at 413 n.3, 125 S.Ct. 834 (Souter, J., dissenting) ("Any difference between the dwelling in Kyllo and the trunk of the car ... may go to the issue of the reasonableness of the respective searches, but it has no bearing on the question of search or no search.... The justifications required by the Fourth Amendment may or may not differ as between the two practices, but if constitutional scrutiny is in order for the imager, it is in order for the dog.").
¶45 One might be tempted to underestimate the privacy interests at stake here. Consider how the Kyllo Court emphasized that a thermal imager could reveal "intimate details" of the home in reaching its conclusion that the use of the imager constituted a *409 search. 533 U.S. at 38, 121 S.Ct. 2038. In contrast, in Dow Chemical Co. v. United States , the Court reasoned in part that aerial photographs of an industrial complex didn't violate the Fourth Amendment because the photos were "not so revealing of intimate details" and commercial property enjoys a lesser degree of privacy than the home. 476 U.S. 227, 237-38, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). As the Court stated, "[t]he intimate activities associated with family privacy and the home and its curtilage simply do not reach the outdoor areas or spaces between structures and buildings of a manufacturing plant." Id. at 236, 106 S.Ct. 1819. Though automobiles have traditionally been accorded lesser protections than homes, a person surely engages in more "intimate activities" in the solitary confines of his car as compared to the "outdoor areas or spaces between buildings of a manufacturing plant." Id. Such intimate activities may include lawful transportation of an ounce or less of marijuana to treat symptoms of a chronic illness, mitigate mental health conditions, or engage in recreational activities that, while legal, one would just as soon not have disclosed to the public. See Leg. Council Colo. Gen. Ass., Research Publ'n No. 475-0, An Analysis of the 2000 Statewide Ballot Proposals 2 (2000); Leg. Council Colo. Gen. Ass., Research Publ'n No. 614, 2012 State Ballot Information Booklet 12 (2012). And Kilo's extraordinarily powerful nose can uncover this lawful activity. Though the sniff wouldn't necessarily result in the disclosure of why a person is carrying lawful amounts of marijuana, a person may still reasonably expect that his decision to engage in lawful activity for such personal reasons to remain private from others, including from a police officer and his canine.
¶46 We certainly aren't the first to notice the similarities between a well-trained drug-detection dog and other forms of investigative, sense-enhancing technologies that can reveal private, lawful activity. See, e.g. , Unruh , 713 P.2d at 376-77 (discussing the rationale of a minority of courts that concluded a sniff was a search). As the concurrence observed in United States v. Bronstein :
There is no legally significant difference between the use of an X-ray machine or magnetometer to invade a closed area in order to detect the presence of a metal pistol or knife, which we have held to be a search, and the use of a dog to sniff for marijuana inside a private bag. Each is a non-human means of detecting the contents of a closed area without physically entering into it.... Neither constitutes a particularly offensive intrusion, such as ransacking the contents of the hidden space, or exposing a person to indignities in the case of a personal search. But the fact remains that each detects hidden objects without actual entry and without the enhancement of human senses. The fact that the canine's search is more particularized and discriminate than that of the magnetometer is not a basis for a legal distinction. The important factor is not the relative accuracy of the sensing device but the fact of the intrusion into a closed area otherwise hidden from human view, which is the hallmark of any search.
521 F.2d 459, 464 (2d Cir. 1975) (Mansfield, J., concurring) (citation omitted); see also Caballes , 543 U.S. at 413, 125 S.Ct. 834 (Souter, J., dissenting) ("[T]he sniff is the first step in a process that may disclose 'intimate details' without revealing contraband, just as a thermal-imaging device might do, as described in Kyllo v. United States ."). And Kilo's sniff isn't all that different from the magnetometer or the thermal-imaging device. Kilo has spent countless hours being trained to detect marijuana-he can even alert to substances placed in a closed box and further sealed off with duct tape. Cf. Katz , 389 U.S. at 361-62, 88 S.Ct. 507 (Harlan, J., concurring) (discussing how the defendant exhibited a subjective expectation of privacy in his phone calls by entering a phone booth and shutting the door behind him, and how that expectation was reasonable). "[Drug-detection dogs] are to the poodle down the street as high-powered binoculars are to a piece of plain glass. Like the binoculars, a drug-detection dog is a specialized device for discovering objects not in plain view (or plain smell)." Jardines , 569 U.S. at 13, 133 S.Ct. 1409 (Kagan, J., concurring).
¶47 Admittedly, many federal courts have come to a different conclusion on whether a sniff of the exterior of a vehicle, or the air *410 surrounding an item, constitutes a search. These courts have reasoned that a person doesn't have a legitimate expectation of privacy under the Fourth Amendment in the odorous molecules that emanate from his car into the open and public airspace. See, e.g. , United States v. Morales-Zamora , 914 F.2d 200, 205 (10th Cir. 1990) ; United States v. Broadway , 580 F. Supp. 2d 1179, 1191 (D. Colo. 2008). However, in those cases, the "odorous molecules" that a drug-detection dog could alert to all belonged to what was clearly contraband-that isn't true anymore in Colorado, where some odorous molecules may be those emanating from lawfully possessed marijuana.[6] In short, none of these cases is on point because none involved legalized marijuana. And that is precisely why we rest our holding on the Colorado Constitution, not on the Fourth Amendment. To the extent we end up alone on a jurisprudential island, it is an island on which Colorado voters have deposited us. Our role is not to question their decision. Rather, it is to apply the logic of existing law to a changing world. Though we are the first court to opine on whether the sniff of a dog trained to detect marijuana in addition to other substances is a search under a state constitution in a state that has legalized marijuana, we probably won't be the last. Since Amendment 64's passage in 2012, nine other states and the District of Columbia have legalized possession of small amounts of marijuana. Marijuana Overview , Nat'l Conference of State Legislatures (Dec. 14, 2018), http://www.ncsl.org/research/civil-and-criminal-justice/marijuana-overview.aspx [https://perma.cc/HMN2-PX38].
¶48 Because a sniff from a dog trained to detect marijuana (in addition to other substances) can reveal lawful activity, we conclude that sniff is a search under article II, section 7 and must be justified by some degree of suspicion of criminal activity.
E. Probable Cause Was Necessary for Kilo's Search
¶49 Because we have concluded that the sniff from a dog trained to detect marijuana is a search under article II, section 7, it follows that the search must be justified by probable cause. However, as we are the first court to consider the impact of marijuana legalization on a sniff from a dog trained to alert to even a hint of marijuana, we consider whether reasonable suspicion would suffice, as the division below concluded after reviewing our pre- Esparza caselaw, or if the intrusion warrants justification under the usual probable cause standard.
¶50 "There is no more basic constitutional rule ... than that which makes a warrantless search unreasonable except in a few 'jealously and carefully drawn' exceptional circumstances." United States v. Watson , 423 U.S. 411, 427, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (quoting Jones v. United States , 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) ). Because warrantless searches are presumptively unreasonable, they must be supported by at least probable cause and justified under at least one of these "carefully drawn" exceptions. Id. ; see also Chambers v. Maroney , 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) ("In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution."). These two bedrock principles apply just as forcefully to the protections promised by article II, section 7. See Sporleder , 666 P.2d at 144 ("In the absence of some narrowly defined exception to the warrant requirement ... a warrantless search is presumed to be invalid."); Mendez v. People , 986 P.2d 275, 279 (Colo. 1999) ("[A] warrantless search is invalid unless it is supported *411 by probable cause and is justified under one of the narrowly defined exceptions to the warrant requirement."). Our analysis thus begins with the presumption that a warrantless search must be supported by probable cause and justified under an exception to the warrant requirement.
¶51 "A police officer has probable cause to conduct a search when 'the facts available to [the officer] would warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." Zuniga , ¶ 16, 372 P.3d at 1057 (alterations in original) (quoting Harris , 568 U.S. at 243, 133 S.Ct. 1050 ). "[P]robable cause is a commonsense concept that requires judges to consider the totality of the circumstances to determine 'whether a fair probability exists that a search of a particular place will reveal contraband or evidence of a crime.' " Id. (quoting Mendez , 986 P.2d at 280 ). This standard does not "lend itself to mathematical certainties," and, instead, "is based on factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act." Mendez , 986 P.2d at 280. But it is more demanding than reasonable suspicion. People v. Polander , 41 P.3d 698, 703 (Colo. 2001) ("Reasonable suspicion is a less demanding standard ... not only in the sense that it can be established with information that is different in quantity or content from that required for probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").
¶52 Reasonable suspicion still requires "specific and articulable facts, greater than a mere hunch" to support a belief that a person was engaging in or had been engaged in criminal activity. People v. Boylan , 854 P.2d 807, 812 (Colo. 1993), abrogated by Esparza , 2012 CO 22, 272 P.3d 367. An officer can conduct a brief, investigatory stop if he has reasonable suspicion to believe that criminal activity "has occurred, is taking place, or is about to take place." People v. Ingram , 984 P.2d 597, 603 (Colo. 1999). And "[s]uspicion of even a minor traffic offense can provide the basis for a stop." People v. Chavez-Barragan , 2016 CO 16, ¶ 10, 365 P.3d 981, 983.
¶53 Two of the judges on the division below agreed that Kilo's sniff was a search requiring reasonable suspicion after looking back to the reasoning of our pre- Esparza caselaw. McKnight , ¶¶ 19-20 (opinion by Dailey, J.) (citing sources). In Unruh , we concluded that requiring reasonable suspicion to justify a dog-sniff search struck the proper "balance" between the government's interest in stopping the illegal narcotics trade and an individual's interest in being free from governmental search and seizure. 713 P.2d at 379. We reasoned that this was so because a dog's sniff was less intrusive than other forms of searches because it was "uniquely selective, detecting in most cases only the presence of narcotics." Id. If a dog alerted, in theory, it would only disclose to the officers the presence of contraband-the sniff couldn't disclose any specific details regarding the lawful contents of a vehicle. Accordingly, we concluded the dog-sniff search was minimally intrusive, and required only reasonable suspicion rather than probable cause to utilize. Id.
¶54 However, Unruh , and the line of cases following, were decided when marijuana was still wholly illegal under state law and, thus, a drug-detection dog's sniff could only uncover the presence or absence of illegal contraband. And perhaps at the time, treating a sniff from a drug-detection dog as a minimally invasive search only necessitating reasonable suspicion did balance the interests at stake.[7] But that is no longer the case. The sniff can now reveal details concerning lawful activity, the possession of up to an ounce of marijuana by adults twenty-one and older. We see no reason to treat a search that could *412 reveal legal marijuana any differently from a search that could reveal other lawful activity. Cf. Arizona v. Hicks , 480 U.S. 321, 328-29, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (refusing to create a sort of quasi-search that need only be justified by reasonable suspicion because it was less intrusive than other search tactics). Regardless of the relative intrusiveness or invasiveness, if law enforcement action constitutes a search, it must be authorized by a warrant from a neutral magistrate or justified by an exception to the warrant requirement and supported by probable cause.
¶55 Thus, we conclude that a sniff from a dog trained to alert to marijuana is a search in Colorado that must be supported by probable cause and justified under an exception to the warrant requirement, such as the automobile exception.
F. There Was No Probable Cause for Kilo's Search
¶56 So before Kilo's alert, what factors suggested there was probable cause to believe McKnight's car contained illegal narcotics under state law? The People emphasize that McKnight parked outside a house in which drugs had been found and that Officer Gonzales knew that McKnight's passenger had used methamphetamine in the past. But McKnight's decision to park near the house tells us little, considering that almost two months had passed since drugs were found there. See People v. Miller , 75 P.3d 1108, 1114-15 (Colo. 2003) (concluding that information about alleged criminal activity that was nearly a month old was too "stale" to provide probable cause for a search warrant). Moreover, even if we were to speculate (without record support) that the house was and remained a drug den, the record reveals that, on the evening in question, no one exited the truck or the house. Therefore, the People's observation that McKnight stopped his vehicle long enough to effectuate a drug deal and use any substance that had been bought is irrelevant. And we have consistently rejected the notion that "a history of past criminal activity in an area is itself sufficient to create a reasonable suspicion that a crime is being, has been, or will be committed." Outlaw v. People , 17 P.3d 150, 157 (Colo. 2001) (citing People v. Greer , 860 P.2d 528, 531 (Colo. 1993) ; People v. Rahming , 795 P.2d 1338, 1342 (Colo. 1990) ). If "a history of past criminal activity in an area" wasn't enough on its own to establish reasonable suspicion of criminal activity, then it also wouldn't be enough on its own to satisfy the more stringent standard of probable cause.
¶57 As for the passenger's drug history, Officer Gonzales could offer no details. All he could say with certainty is that whatever drug usage he recalled "wasn't super recent." The People encourage us to take notice of how difficult it is to overcome methamphetamine addiction and to extrapolate that the passenger was still using. On a record so lacking in details, we decline the invitation. Even if we accepted, it isn't clear that it would yield probable cause to believe that contraband would be found in the truck. Cf. Greer , 860 P.2d at 531 n.2 (citing Sibron v. New York , 392 U.S. 40, 62-63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.")); People v. Feltch , 174 Colo. 383, 483 P.2d 1335, 1337 (1971) (rejecting "the theory that birds of a feather flock together" and stating "[g]uilt by association has never been an acceptable rationale and it does not constitute probable cause to arrest"). We are loathe to create a rule that would allow police to randomly search known drug users. Cf. Robinson v. California , 370 U.S. 660, 666-68, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (holding that a California statute that criminalized narcotic addiction itself was unconstitutional). In other words, drug users have the same constitutional rights as everyone else.
¶58 The question becomes: Are (1) proximity to a house in which drugs had been found nearly two months earlier, and (2) the presence of someone who "at some point" had used an illegal drug enough to establish a fair probability that contraband under state law would be found in McKnight's truck on the evening in question, thus justifying Kilo's sniff? Even when considered together, these *413 two facts are insufficient to establish probable cause to believe McKnight's truck contained illegal narcotics under state law. We can look to Zuniga for an illuminating comparison. There we found probable cause to search a car because the driver and passenger had "divergent" stories about their visit to Colorado, they were "extreme[ly] nervous[ ]," there was a "strong odor of raw marijuana," and a drug-detection dog alerted at the back of the vehicle. Zuniga , ¶ 1, 372 P.3d at 1054. Though we did not need to resolve whether the sniff constituted a search in that case, we noted that an alert alone was ambiguous in light of Amendment 64. Id. at ¶¶ 20-21. And the totality of the circumstances-the "differing" stories, the "exceptional" nervousness, and the strong scent of unburnt marijuana that the officer was able to smell with his own nose-supported the officer's conclusion that there was a fair probability that a search would reveal evidence of a crime. Id. Here though, without Kilo's alert, the officers just observed McKnight's truck near a house where the last documented criminal activity occurred nearly two months before and McKnight's passenger was a person who had used illegal drugs at some point in the not "super recent" past. That isn't enough to warrant the sniff, or the subsequent intrusion into McKnight's truck. See Greer , 860 P.2d at 531 & n.2.
¶59 Thanks to the subsequent hand search of McKnight's truck, which only revealed the pipe with methamphetamine residue, we can infer that Kilo was not alerting to the scent of lawfully possessed marijuana. But, as noted at the outset of our analysis, we don't measure a search's constitutionality by looking at what it reveals. Rather, we examine the constitutionality of a search based on what was known at the time it was conducted.
¶60 And, like the division, we cannot conclude that "the evidence properly received against [McKnight was] so overwhelming that the constitutional violation was harmless beyond a reasonable doubt." McKnight , ¶ 24 (opinion of Dailey, J.) (citing Bartley v. People , 817 P.2d 1029, 1034 (Colo. 1991) ). Indeed, the People do not contend otherwise. Opening Brief at 10 ("The People concede that if this Court [were] to find that the trial court erred in denying McKnight's suppression motion, the error could not be harmless.").
G. Exclusion of the Pipe Is the Remedy for this Violation of the Colorado Constitution
¶61 Exclusion is the appropriate remedy for this constitutional violation. Though we have previously affirmed suppression orders excluding evidence obtained in violation of article II, section 7, we have not explicitly addressed whether we adopted a state corollary to the federal exclusionary rule. See, e.g. , Oates , 698 P.2d at 816, 819 (Colo. 1985) (affirming the suppression of evidence obtained from an illegal search under article II, section 7, without expressly analyzing exclusion as the remedy). Yet, in affirming suppression of evidence obtained in violation of article II, section 7, we have implied that we are open to finding exclusion to be the proper remedy for violations of state constitutional law. See Corr , 682 P.2d at 22, 27-28 (rejecting the application of the statutory good faith exception, and in affirming the suppression of toll telephone call records obtained in violation of article II, section 7, suggesting we approved of exclusion as the remedy); see also 1 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 1.5(b) (5th ed. Oct. 2018 update) (noting that state courts often suppress evidence obtained in violation of state constitutional prohibitions against unreasonable searches and seizures while "seldom" explaining their rationale for concluding "that the exclusionary remedy is just as appropriate [for state law violations] as when the Fourth Amendment is violated"). To the extent that we have not yet explicitly embraced the exclusionary rule as a remedy for violations of article II, section 7, we do so now. We recognize that the federal courts have created several exceptions to the exclusionary rule, see, e.g. , United States v. Leon , 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and that we have our own statutory good-faith exception, see § 16-3-308, C.R.S. (2018), but we need not address the applicability of those exceptions. Because the prosecution did not raise any arguments about the exclusionary rule or its exceptions at the *414 suppression hearing, we consider those arguments waived and decline to address them on appeal. See People v. Crippen , 223 P.3d 114, 116-17 (Colo. 2010) ; People v. Donahue , 750 P.2d 921, 923 (Colo. 1988).
III. Conclusion
¶62 We hold that a sniff from a drug-detection dog that is trained to alert to marijuana constitutes a search under article II, section 7 of the Colorado Constitution because that sniff can detect lawful activity, namely the legal possession of up to one ounce of marijuana by adults at least twenty-one years old. We further hold that, in Colorado, law enforcement officers must have probable cause to believe that an item or area contains a drug in violation of state law before deploying a drug-detection dog that alerts to marijuana for an exploratory sniff. Because there was no such probable cause justifying Kilo's search of McKnight's truck, the trial court erred in denying McKnight's motion to suppress.
¶63 This holding is based solely on the protections afforded by our state constitution, and to the extent we discuss any federal cases in coming to our conclusion, it is only for the purpose of analogy and comparison. See Michigan v. Long , 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
¶64 Accordingly, we affirm the court of appeals' decision to reverse McKnight's judgment of conviction.
CHIEF JUSTICE COATS dissents, and JUSTICE BOATRIGHT and JUSTICE SAMOUR join in the dissent.
JUSTICE SAMOUR dissents, and JUSTICE BOATRIGHT joins in the dissent.

We granted certiorari on two issues:
1. Whether, given marijuana's status as legal in some regards under state law and illegal under federal law, marijuana is 'contraband' for the purpose of a drug-detection dog's sniff.
2. Whether an alert by a drug-detection dog that is trained to detect marijuana and other controlled substances can supply probable cause to justify a search.

There are other limitations on the use of drug-detection dogs not at issue here. First, the dog and its handler must be in a place where they have a right to be. Florida v. Jardines , 569 U.S. 1, 8-9, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). Second, the use of a drug-detection dog during a traffic stop may not impermissibly prolong the stop. Rodriguez v. United States , --- U.S. ----, 135 S. Ct. 1609, 1612, 191 L.Ed.2d 492 (2015). McKnight does not assert that the police violated either of these limitations.

The U.S. Supreme Court later reached a similar holding in Rodriguez , 135 S. Ct. at 1612.

Caballes , however, did not address the effect of a state law legalizing marijuana on the question of whether a resident of the state would have a legitimate expectation of privacy in lawful possession of marijuana.

The People argue that, because marijuana remains federal contraband, we don't need to alter our dog-sniff jurisprudence. The People further suggest that, because of marijuana's contraband status under federal law, an alert from a drug-detection dog trained on marijuana still supplies probable cause to believe illegal narcotics are present despite Amendment 64. Yet, conspicuously absent from the People's appeal to federal law is an argument that Amendment 64 is preempted by federal law. See McKnight , ¶ 17 n.3 (opinion of Dailey, J.) ("No question has been raised in this case about whether Amendment 64 is preempted by federal law."); McKnight , ¶ 29 (Berger, J., specially concurring) ("The Attorney General does not contend that Amendment 64 is displaced by the Supremacy Clause of the Federal Constitution."). The People cannot contend that marijuana's status as illegal under federal law controls our state law analysis while simultaneously avoiding preemption. Because the People declined to address preemption, we refrain as well. Cf. Greenlaw v. United States , 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

Other cases are further distinguishable because the item sniffed was in some public space, such as at an airport, United States v. Goldstein , 635 F.2d 356, 358-59 (5th Cir. 1981), or on a bus, United States v. Gant , 112 F.3d 239, 240-41 (6th Cir. 1997), or other area where people cannot reasonably expect to have the same level of privacy as in a motor vehicle. And, in some cases, the officers already had "considerable information" that an individual was engaged in illegal narcotics activity before deploying the drug-detection dog, United States v. Cruz , 1:07-cr-145-WSD, 2008 WL 11383985, *2 (N.D. Ga. May 15, 2008) ; in others, the defendant consented to a hand search of the vehicle that began before a dog was even deployed, United States v. Corrujedo , No: 5:17-CR-24-RWS-CMC, 2017 WL 8809641, at *18 (E.D. Tex. Dec. 22, 2017).

We may have overstated the "minimally intrusive" nature of an exploratory sniff from a drug-detection dog in our past cases. Justice Ginsburg put it bluntly in her dissent in Caballes : "A drug-detection dog is an intimidating animal." 543 U.S. at 421, 125 S.Ct. 834 (Ginsburg, J., dissenting). And she makes a good point. For the motorist stopped for a routine traffic violation and then subjected to an exploratory sniff, the use of these four-legged law enforcement tools "changes the character of the encounter between the police and the motorist.... [it] becomes broader, more adversarial...." Id.