**[Cite as *State v. Pack*, 2020-Ohio-5033.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | |
|---|---|
| STATE OF OHIO | : |
| | : |
| Plaintiff-Appellee | : Appellate Case No. 28458 |
| | : |
| v. | : Trial Court Case No. 2017-CR-4050/1 |
| | : |
| WARREN D. PACK | : (Criminal Appeal from |
| | Common Pleas Court) |
| Defendant-Appellant | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of October, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MARK A. FISHER, Atty. Reg. No. 0066939, 5613 Brandt Pike, Huber Heights, Ohio 45424
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court overruled his motion to suppress, Warren D. Pack pled no contest to one count of aggravated possession of drugs, a felony of the third degree. The trial court imposed 30 months in prison, to be served concurrently with sentences in other cases. The court credited Pack with 104 days of jail time credit.

{¶ 2} Pack appeals from his conviction, challenging the trial court's denial of his motion to suppress and the court's calculation of jail time credit. For the following reasons, the trial court's judgment will be affirmed.

### I. Facts and Procedural History

{¶ 3} The evidence at the suppression hearing consisted of the testimony of four Huber Heights police officers: Officer Shawn Hershner, Officer Ronald Settich, Officer Michael Reckner, and Detective Robert Bluma. The State also presented a video recording of Pack's police interview, his waiver of rights form, and a dispatch log.[1] The trial court made the following factual findings, which are supported by the record.

{¶ 4} At approximately 4:53 p.m. on July 21, 2017, Officers Hershner and Settich were dispatched to a business located at 7215 Taylorsville Road on a report of a suspicious vehicle. The business's owners had reported that they recently had a trailer stolen and they could see on the business's cameras that a vehicle was parked in the back of the business.

{¶ 5} Officer Hershner arrived at the location at 4:57 p.m. and saw a "box truck U-Haul" parked alone behind the business. The officer testified that the business did not

---

[1] The trial court held a joint suppression hearing on motions filed by both Pack and his wife, who was also charged. We focus on the evidence related to Pack.

have parking spaces in that location. Hershner did not have his lights or siren activated when he responded to the dispatch.

{¶ 6} Officer Hershner exited his cruiser and approached the U-Haul on the driver's side. Pack's wife, Hillary, was in the driver's seat, and Pack was in the passenger seat; the couple's dog was also in the vehicle. The Packs were eating food from Hardee's. The officer told the Packs why he was there and asked what they were doing there. Officer Hershner testified that "they became very argumentative within the first couple of seconds of me being there." Hershner stated that he did not know the Packs but had heard about them from other officers. Specifically, Hershner stated, "They're known to have drugs on them. We -- the midnight crew had just had contact with them days prior and found drugs on them in that same U-Haul vehicle."

{¶ 7} Officer Hershner observed the Packs' behavior. He described them as "very erratic," "up and down," and "very argumentative." He stated that, "[a]t one point, they would be nice and then the next minute they were screaming and yelling at me. And they also were sweating very profusely. It wasn't very hot that day. * * * And I didn't feel that there was a reason why they should be sweating that much. And then with their behavior, it felt like maybe something more was going on." At 4:58 p.m., approximately a minute after arriving on scene, Officer Hershner requested that a canine officer respond to the scene due to the Packs' behavior, the messiness of the vehicle, and other officers' dealings with the Packs. Hershner testified that he also saw little round clear pieces of plastic that are used to store drugs in the Packs' vehicle.

{¶ 8} Officer Hershner told the Packs that they needed to leave, and the Packs refused, stating that they had a right to be there. (Hershner stated that, because it was

private property, the business owner had the ability to trespass the Packs, but the officer did not have that authority.) Hershner asked for the Packs' identification. Hillary was argumentative and initially refused to provide her identification, but ultimately complied after the officer told her she could be charged with obstruction. Pack complied more promptly. Using his radio, Hershner ran their identifications through dispatch. Neither had any warrants.

{¶ 9} Officer Hershner asked the Packs to exit their vehicle in anticipation of the canine's sniff of the truck (a "free air sniff"). Pack's wife started the car and rolled up her window as if to leave. Hershner talked to Hillary through the window, and she eventually complied. Officer Settich arrived at the scene at 5:00 p.m., while Officer Hershner talked with Hillary through the window.[2]

{¶ 10} Officer Settich testified that he spoke with Pack while Officer Hershner spoke with Hillary. Settich stated that Pack kept asking why the officers were harassing them. Settich told Pack that the officers were called there due to a suspicious vehicle on the side of the business.

{¶ 11} Officer Reckner arrived with his canine partner, Adu, at 5:07 p.m. At that time, Officers Hershner and Settich were trying to get the Packs out of their vehicle. After about a minute, Officer Reckner told the Packs that they needed to get out of the vehicle

---

[2] Settich stated that he arrived approximately four to five minutes after Hershner. He testified that he heard Officer Hershner radio for a canine unit about five to ten minutes after he (Settich) arrived and that it could have taken up to 15 minutes for Officer Reckner to arrive. Settich's testimony in this respect was inconsistent with the other officers' testimony and the dispatch log, and the trial court's decision appears not to have credited this testimony.

or they would be arrested. Both Pack and his wife exited the vehicle.[3] Reckner also asked Pack twice to remove the dog from the vehicle, but Pack was argumentative. When Pack did not comply with that request, Officer Reckner walked his dog around the U-Haul with the Packs' dog still inside the U-Haul. Reckner indicated that Adu was trained to conduct a free air sniff with another dog in the vehicle.

{¶ 12} While Officer Reckner walked Adu around the U-Haul, Officer Hershner patted down Pack for safety; no evidence was obtained from this pat-down. Based on Hillary's clothing (tank top and shorts), the officer was not concerned about her having a weapon.

{¶ 13} Adu alerted on the back of the vehicle at 5:13 p.m. Officer Reckner informed the Packs about the alert and of his intention to search the vehicle; he asked if there was anything else in the vehicle. Pack's wife indicated that there might be marijuana, but she refused to provide the officers with the keys to the U-Haul. After giving Hillary multiple warnings, Reckner arrested her for obstructing official business and placed her in a cruiser. Officer Reckner had Pack remove the dog from the U-Haul and stand with Officer Settich. Settich testified that he spoke with Pack about finding accommodations for the dog. Pack's mother came and got the dog from the scene.

{¶ 14} Officers Hershner and Reckner searched the U-Haul. The officers located methamphetamine, among other items, in the vehicle. The officers then arrested Pack and placed him in a separate cruiser. Officer Settich took Pack to the police station, arriving there at approximately 6:15 p.m. Another officer took Pack's wife to the station.

---

[3] Officer Settich further testified that Officer Reckner conducted the free air sniff while the Packs were in their vehicle; the trial court found that Settich was "mistaken."

No *Miranda* warnings had been provided at the scene.

{¶ 15} Detective Bluma was called to the police station to question the Packs after their arrests. Bluma interviewed Hillary first, and then Pack. Prior to the interrogation with Pack, Bluma reviewed a constitutional rights form with him. Pack orally indicated that he understood each right, and he signed the form. The interview lasted for about an hour. Pack was 35 years old and had 12 years of schooling at the time of the interview.

{¶ 16} Pack subsequently moved to suppress the evidence against him. At the suppression hearing, Pack asserted that (1) the stop was unlawful, (2) the detention was unlawfully prolonged for a canine sniff, (3) the officers searched him unlawfully, (4) the officers did not have probable cause to search his vehicle, and (5) the statements he made at the scene were without the benefit of *Miranda* warnings. After a hearing, the trial court overruled the motion in its entirety.

{¶ 17} As stated above, Pack later pled no contest to aggravated possession of drugs (bulk amount but less than five times the bulk amount). The court found him guilty and imposed 30 months in prison, to be served concurrently with another Montgomery County case and a case from Clark County. The court ordered that Pack receive 104 days of jail time credit.

{¶ 18} Pack appeals from the trial court's judgment, challenging the denial of his motion to suppress and the amount of jail time credit.

## II. Motion to Suppress

{¶ 19} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford,* 93 Ohio App.3d 586, 592, 639

N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 20} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Whether a stop and/or search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances. *See State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.

{¶ 21} Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 22} On appeal, Pack argues that the officers lacked a reasonable and articulable suspicion of criminal activity to justify his detention, that there was no basis for a free air sniff, and that the detention was unlawfully prolonged for the free air sniff. Pack does not challenge the pat-down for weapons or the trial court's ruling regarding any statements he made.

{¶ 23} The State argues that Officer Hershner's initial interaction with the Packs was a consensual encounter, not a detention. Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such encounters. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *Mendenhall* at 554. In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the police officer's conduct, not the subjective state of mind of the person stopped. *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25.

{¶ 24} As the State argues, the record suggests that the encounter began as a consensual encounter. Officer Hershner drove to the business without lights and sirens and approached a parked vehicle. Officer Hershner's initial request was for the couple to leave, not to stay. The officer's subsequent testimony that Hillary turned on the vehicle as if to drive away indicates that Hershner's cruiser was not parked in a position that prevented the U-Haul from leaving. Hershner's asking the Packs what they were doing

did not convert the encounter into an investigatory detention. *See State v. Ward*, 2017-Ohio-1391, 89 N.E.3d 124, ¶ 26 (2d Dist.).

{¶ 25} Even if this were not a consensual encounter initially, Officers Hershner and Settich were dispatched to a business at the request of the business's owners, who had recently had a trailer stolen from their parking lot. Officer Hershner located the U-Haul beside the business in an area that was not marked for parking. The presence of the U-Haul in a suspicious location created a reasonable suspicion that the occupants of the vehicle may have been involved in criminal activity, such that the officers were justified in briefly detaining the occupants for the purpose of determining whether criminal activity was afoot. *See Terry.*

{¶ 26} Once Officer Hershner engaged with the Packs, he found their behavior to be suspicious and indicative of possible drug activity. He described them as "very erratic," "up and down," and "very argumentative." Hershner believed they were sweating "very profusely," more than the weather warranted. Hershner was aware that the Packs previously had engaged in drug activity in that vehicle, and the officer testified that he also saw little round clear pieces of plastic that are used to store drugs. With the information before him, Officer Hershner had a reasonable and articulable suspicion that Pack was engaged in criminal activity, such as drug possession.

{¶ 27} "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. "[A]n officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 13 (2d Dist.),

quoting *Rodriguez v. United States*, 575 U.S. 357, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). A police officer need not have a reasonable suspicion that a vehicle contains contraband prior to summoning a canine drug unit or conducting a canine free air sniff. *State v. Thomas*, 2d Dist. Montgomery No. 22833, 2009-Ohio-3520, ¶ 15.

{¶ 28} In this case, the officers did not prolong the stop to conduct the canine sniff. Officer Hershner requested a canine unit within a minute of arriving at the scene. Officer Reckner arrived with his canine partner, Adu, at 5:07 p.m., ten minutes after Officer Hershner first arrived at the scene. During those ten minutes, Officer Hershner spoke with the Packs about why they were at the business, obtained the Packs' identifications, and ran the information through dispatch. When Reckner arrived, Hershner was trying to get the Packs to exit the U-Haul. Officer Reckner promptly walked Adu around the U-Haul once the Packs exited the vehicle and after Pack failed to remove his dog from the vehicle.

{¶ 29} The use of a trained narcotics dog to sniff an automobile does not constitute a "search" under the Fourth Amendment. *State v. Raslovksy*, 2d Dist. Clark No. 2019-CA-55, 2020-Ohio-515, ¶ 14, citing *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). If a trained canine alerts to the odor of drugs from a lawfully stopped and detained vehicle, an officer has probable cause to search the vehicle for contraband. *Id.*, citing *Florida v. Harris*, 568 U.S. 237, 250, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013).

{¶ 30} Once Adu alerted on the U-Haul, the officers had probable cause to enter and search the U-Haul for contraband. The officers' seizure of methamphetamine and other contraband from the vehicle was lawful. Accordingly, the trial court did not err in denying Pack's motion to suppress the evidence against him.

{¶ 31} Pack's assignment of error related to the motion to suppress is overruled.

### III. Jail Time Credit

{¶ 32} In his supplemental brief,[4] Pack claims that the trial court erred in finding that he was entitled to 104 days of jail time credit, rather than 504 days.   We disagree.

{¶ 33} R.C. 2967.191, governing jail time credit, implements the equal protection right to credit for prior incarceration.   *State v. Fugate*, 117 Ohio St.3d 261, 2008-Ohio-856, 883 N.E.2d 440, ¶ 8; *State v. Angi*, 2d Dist. Greene No. 2011 CA 72, 2012-Ohio-3840, ¶ 7, citing *State v. Coyle*, 2d Dist. Montgomery No. 23450, 2010-Ohio-2130, ¶ 5. The statute provides, in part:

> The department of rehabilitation and correction shall reduce the prison term
>
> of a prisoner * * * by the total number of days that the prisoner was confined
>
> for any reason arising out of the offense for which the prisoner was
>
> convicted and sentenced, including confinement in lieu of bail while awaiting
>
> trial, confinement for examination to determine the prisoner's competence
>
> to stand trial or sanity, [and] confinement while awaiting transportation to
>
> the place where the prisoner is to serve the prisoner's prison term * * *.

R.C. 2967.191(A).

{¶ 34} "Although the [department of rehabilitation and correction] has a mandatory duty pursuant to R.C. 2967.191 to credit an inmate with jail time already served, it is the trial court that makes the factual determination as to the number of days of confinement

---

[4] Pack refers to this document as an "amended" brief.   The amended brief raises a new issue (jail time credit) without restating the suppression issue raised in his original appellate brief.   Pack's motion for leave to file the amended brief indicated that he intended to supplement, not replace, his original brief.   Accordingly, we consider Pack to have filed a supplemental, rather than amended, brief.

that a defendant is entitled to have credited toward his sentence." *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 98 Ohio St.3d 476, 2003-Ohio-2061, 786 N.E.2d 1286, ¶ 7.

{¶ 35} The trial court orally sentenced Pack on this and two other Montgomery County cases on June 13, 2019 and filed its written judgment entry on June 17, 2019. Pack was conveyed to prison on June 19.

{¶ 36} Both orally and in its written judgment, the trial court awarded 104 days of jail time credit.[5] According to a jail time credit portion of the presentence investigation report, this calculation was based on the following information:

| Date Range | Event | JTC |
|---|---|---|
| July 21 – July 22, 2017 | Pack arrested for the offense in this case | 2 |
| December 30, 2017 – April 10, 2018 | Pretrial confinement on this and/or other cases | 102 |
| April 11, 2018 – June 13, 2019 | Serving 30-month sentence in Clark C.P. Case No. 17-CR-647 | 0 |

{¶ 37} Pack asserts that he should have received credit for the period between February 1, 2018 and June 19, 2019, a total of 504 days. As shown above, Pack received credit for the period between February 1, 2018 and April 10, 2018.

{¶ 38} As for the period after April 10, Pack was not entitled to jail time credit for the time that he was serving his Clark County sentence. It is well settled that a "defendant may accrue jail time credit in multiple cases at the same time, if he or she is

---

[5] In its appellate brief, the State argues that the trial court should have credited Pack with less than 104 days. However, the State did not appeal the trial court's jail time credit determination or specifically ask us to modify the amount awarded. Accordingly, we will focus on Pack's argument that he was entitled to more than 104 days.

held in pretrial confinement in multiple cases simultaneously." *See, e.g., State v. Breneman*, 2d Dist. Champaign No. 2015-CA-16, 2016-Ohio-597, ¶ 26. "Where a later-sentencing court makes its sentence concurrent with an earlier sentence, a defendant is entitled to jail-time credit in both cases for any time that he was held in pretrial confinement on both cases simultaneously." *State v. Steinmetz*, 2d Dist. Greene No. 2019-CA-40, 2020-Ohio-1145, ¶ 12.

{¶ 39} However, the Ohio Supreme Court has made clear that a defendant is not entitled to jail-time credit while held on bond if, at the same time, the defendant is serving a sentence on an unrelated case. *State v. Cupp*, 156 Ohio St.3d 207, 2018-Ohio-5211, 124 N.E.3d 811, ¶ 24. Even prior to *Cupp*, we consistently held that jail time credit is not appropriate where the defendant was serving a sentence for a separate case. *See, e.g., State v. Russell*, 2d Dist. Montgomery No. 26503, 2015-Ohio-3373 (defendant's jail time credit for his felony case did not include time that he spent in jail serving a misdemeanor sentence while his felony case was pending); *State v. Spear*s, 2d Dist. Montgomery No. 25645, 2014-Ohio-146, ¶ 2 ("Jail time credit is not permitted under R.C. 2967.191 where the defendant was serving time for a separate offense."); *State v. Angi*, 2d Dist. Greene No. 2011-CA-72, 2012-Ohio-3840; *State v. Rios*, 2d Dist. Clark No. 10-CA-59, 2011-Ohio-4720. Accordingly, we find no error in the trial court's failure to award jail time credit for the period of time between April 11 and June 19, 2019, while Pack was serving his Clark County sentence.

{¶ 40} Pack's supplemental assignment of error is overruled.

### IV. Conclusion

{¶ 41} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Mark A. Fisher
Hon. Gerald Parker