[Cite as *State v. Burke*, 2022-Ohio-2166.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29256 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-2878 |
| | : | |
| NOAH MATTHEW BURKE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 24th day of June, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JAMES C. STATON, Atty. Reg. No. 0068686, 5613 Brandt Pike, Huber Heights, Ohio 45424
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Noah Matthew Burke, appeals from his conviction following a no-contest plea to having a weapon under disability (a third-degree felony), trafficking in marijuana (200 grams but less than 1,000 grams, a fourth-degree felony), possession of LSD (10 unit doses but less than 50 doses, a fourth-degree felony), and possession of marijuana (200 grams but less than 500 grams, a fifth-degree felony). The no-contest plea followed the court's denial of Burke's motion to suppress evidence.

{¶ 2} According to Burke, the trial court should have granted the motion to suppress because the arresting officer detained Burke for a time exceeding what was needed to research and issue a citation. Burke also argues that suppression was proper because a free-air search of his vehicle was conducted by a canine dog who alerts to both legal and illegal substances. Specifically, Burke contends that an illegal substance (marijuana) and legal substances (medical marijuana, hemp, and CBD oil) all contain tetrahydrocannabinol ("THC"). Thus, because the canine dog used in this case could not distinguish between illegal and legal substances, there was no justification for a warrantless search.

{¶ 3} We conclude that the trial court did not err in denying the motion to suppress evidence. The police did not improperly extend the duration of a lawful stop of Burke's vehicle. Moreover, police may detain a stopped driver beyond a normal time frame if they encounter additional facts giving rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop. Such facts existed here. The police officer also had probable cause for a search based on his observation of marijuana "shakes" on Burke's person and his perception of a marijuana odor emanating

from Burke's person and the car trunk, which all occurred before the dog alerted to drugs during the free-air sniff.

{¶ 4} Given these holdings, we decline to consider whether the free-air sniff here might have been insufficient based on the legalization of hemp, CBD oil, or medical marijuana.

{¶ 5} The trial court correctly overruled the motion to suppress, and the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 6} On March 22, 2021, an indictment was filed charging Burke with the above weapons and drug charges.   The indictment arose from a traffic stop that occurred on August 26, 2020, in West Carrollton, Ohio.    At the time, West Carrollton Police Officer Matt Harper was working as a road patrol officer from 11:45 p.m. on August 25 to 8:00 a.m. on August 26, 2020.   Transcript of Proceedings (Motion to Suppress) ("Tr."), p. 5-6. Harper was wearing his uniform and was driving a marked police cruiser.   *Id.* at p. 7.

{¶ 7} At around 1:30 a.m., Officer Harper observed Burke's automobile approaching from the rear and traveling over the posted speed limit of 25 miles per hour. *Id.* at p. 7-8.   Harper visually estimated the speed at 37 miles per hour, activated his radar, and confirmed that Burke was traveling at 35 miles per hour, which rapidly decreased to 27 miles per hour.   *Id.* at p. 8.   Harper then initiated a traffic stop and made contact with Burke, who was alone in the car.   *Id.* at p. 9.

{¶ 8} Harper informed Burke of the reason for the stop and asked for his driver's

license and proof of insurance. *Id.* When Burke handed Harper his driver's license, his hands were visibly shaking, which displayed nervous tendencies and was not very common for a typical traffic stop *Id.* at p. 9 and 23-24. Burke was able to provide his license but was unable to produce an insurance card. *Id.* at p. 9. Harper went back to his cruiser, ran the information through LEADS, and determined Burke was a valid driver. *Id.* Harper was also able to confirm that Burke had no warrants and that the vehicle was not stolen. *Id.* at p. 21. At that time, Harper would have had the information he needed to write a citation. *Id.*

{¶ 9} While running Burke's name through LEADS, Harper recognized the name from a prior encounter but could not recall the incident. As a result, Harper also ran Burke's name through the police department's in-house system. He then recalled a 2019 incident in which he had dealt with Burke as a juvenile. *Id.* at p. 10 and 24. Harper knew that Burke had a prior weapons charge as a juvenile but did not know if it had been dismissed or was some type of probation-eligible situation. *Id.* at p. 16. Burke did not present Harper with a permit to carry a concealed weapon in connection with the encounter; Burke was only 18 or 19 at the time and would not have been eligible. *Id.*

{¶ 10} At this point, Harper went back to Burke's vehicle and asked if he could search it. This was based on knowing that a friend of Burke's had been killed and had been involved in drug trafficking, seeing Burke's previous charges and what Burke had admitted to during a previous police interview, and seeing Burke's hands visibly shaking. Tr. at p. 10 and 25. This was about five minutes after the initial stop. *Id.* at p. 25. Burke did not consent to a search. *Id.* at p. 10.

{¶ 11} Before asking to search, Harper handed Burke's license back and asked if he could provide proof of insurance, but Burke could not. *Id.* Harper then returned to his cruiser to begin filling out a citation. At that time, Harper also asked for a canine unit. *Id.* The canine unit arrived 21 minutes after the initial stop. *Id.* at p. 10 and 29. Within a few minutes after Harper had called for the canine unit, Harper's shift supervisor, Sgt. Brannon, arrived at the scene. *Id.* at p. 26.

{¶ 12} While filling out the citation, Harper had noticed another issue with the vehicle. To make sure he was filling the citation out properly, Harper walked back up to Burke's vehicle again to confirm that the address was correct, and Burke confirmed the address was correct. Harper had also noticed the vehicle's rear plate had no county or registration sticker; he, therefore approached it to make sure the sticker was not behind something. At that point, Harper detected the odor of raw marijuana coming from what he believed was the trunk area. *Id.* at p. 11 and 29. Harper was familiar with the odor, as he had come in contact with it two or three times a week for the past six years. *Id.* at p. 11 and 30-31. Later, during the stop, Harper told another officer that he thought he had caught a whiff of something, but could not be sure. *Id.* at p. 30.

{¶ 13} Usually, writing a citation takes between eight and 12 minutes. *Id.* at p. 31. However, Harper had not finished writing the citation when the canine unit arrived. Harper briefed the handler on what had occurred, during which time he was not working on the citation. He then removed Burke from the vehicle around 22 or 23 minutes after the stop occurred, so that a free-air sniff could be conducted. *Id.* at p. 30-31. When Harper took Burke out of the car, he saw some loose marijuana, commonly referred to as

"shake," on Burke's shirt and smelled marijuana coming from Burke's person. *Id.* at p. 13 and 31. Burke indicated he had smoked marijuana earlier that evening. *Id.* at p. 14. Harper did not ask Burke if he had a prescription for marijuana, and Burke did not say that he had a prescription. *Id.* at p. 31 and 34.

{¶ 14} Kettering police officer Brandon Harrison was the handler who arrived at the scene with his canine dog, Ox. Tr. at p. 36 and 39. Officer Harrison had trained with Ox for three months in a nationally accredited canine certification program and had also done continuing training after that for 16 to 30 hours a month. *Id.* at p. 36-37. Ox was a dual-purpose dog who did tracking and apprehension as well as drug detection. Ox had been trained to detect cocaine, marijuana, heroin, and meth. *Id.* at p. 38.

{¶ 15} When Harrison got to the scene, he talked with Harper about what had occurred, and Harrison then conducted a free air sniff around the vehicle. During the free air sniff, Ox alerted to the vehicle. *Id.* at p. 40.

{¶ 16} According to Harrison, the canine training was not adjusted after Ohio legalized hemp. The department's newest canine dog, however, was not being trained in marijuana detection. *Id.* at p. 41. Harrison indicated that Ox smells THC, which is an ingredient in marijuana. He likened it to when someone enters a kitchen and smells cookies being made. A dog will walk into the kitchen and smell the eggs, flour, sugar, and so forth. *Id.* at p. 41-42. As to THC, the level does not matter, as the dog is trained with a half- gram of marijuana up to bulk amounts. Ox would alert to a low-grade marijuana as well as a high-end hash oil. *Id.* at p. 42.

{¶ 17} No changes were made in the canine training after Ohio legalized

prescription marijuana and CBD oil, nor were any changes made after certain Ohio cities stopped using canine units to establish probable cause. *Id.*

{¶ 18} After Ox alerted to the vehicle, Harper and Harrison conducted a search and located a substantial amount of marijuana, a firearm, LSD, baggies, a scale, and some other paraphernalia. The majority of the items were located in the trunk area. The large amount of marijuana and a firearm were in the trunk, inside a combination-lock style travel bag. Tr. at p. 14-15 and 44. After the firearm was located, Burke was taken into custody. *Id.* at p. 15. At that time, Harper asked if Burke were willing to speak with him, but Burke declined. *Id.* at p. 16.

{¶ 19} Burke was subsequently charged with various offenses stemming from this incident. After pleading not guilty, Burke filed a motion to suppress on April 21, 2021, and the trial court held a hearing on May 21, 2021. At the hearing, Officers Harper and Harrison testified as indicated above, and the video of the stop was admitted as State's Ex. 1. The parties then filed post-hearing memoranda.

{¶ 20} On July 26, 2021, the trial court overruled the motion to suppress. The court found that Officer Harper had had sufficient probable cause to initiate the traffic stop and that the stop was not unreasonably extended. Decision, Order and Entry Overruling Motion to Suppress (July 26, 2021) ("Decision"), p. 4. The court further found that probable cause had existed for the search of the automobile based on the alert of the narcotics dog and Harper's observation of loose marijuana on Burke's person. *Id.* at p. 5. Finally, the court rejected Burke's argument that suppression was warranted because the canine dog involved in this case had been trained to detect both legal and illegal

substances. The court first stressed that it would not legislate from the bench. *Id.* at p. 6. In addition, the court noted Harrison's testimony that the dog had been trained to detect THC and his comment that CBD oil does not contain THC. Further, the court emphasized that while Ohio has legalized medical marijuana, no evidence was presented indicating that Burke had such a prescription at the time of the stop, nor had Burke made any such claim to the officers. *Id.*

**{¶ 21}** After the motion was overruled, Burke apparently pled no contest to the charges.[1] He was then sentenced on October 15, 2021 to a term of basic probation supervision not to exceed five years, and other conditions, including community service. Burke timely appealed from his conviction.

## II. Suppression

**{¶ 22}** Burke's sole assignment of error states that:

The Trial Court Erred in Overruling Appellant's Motion to Suppress.

**{¶ 23}** Under this assignment of error, Burke has presented two issues. The first concerns Burke's claim that suppression was warranted because the arresting officer

---

[1] We say "apparently," because the transmitted file does not contain any plea documents, nor are there any in the electronic docket on the clerk's website. However, Burke's sentencing memorandum and the court's termination entry both indicate that Burke pled no contest to the charges listed in the indictment. Defendant's Sept. 15, 2021 Sentencing Memorandum, p. 1, and Termination Entry; Community Control (Sept. 16, 2021), p. 1. Nonetheless, a final appealable order exists here, because the termination entry contains the fact of conviction, the sentence, the judge's signature, and a date time and stamp indicating the judgment's entry on the court's journal on September 16, 2021. *See State ex rel. Lemaster v. Meigs Cnty. Court of Common Pleas*, 161 Ohio St.3d 14, 2020-Ohio-3776, 160 N.E.3d 713, ¶ 8-9. We express no opinion on the absence of the plea documents, as neither party has raised the issue, and a final appealable order does exist.

detained him for a period exceeding what was needed to research and issue a citation. In this regard, Burke notes Officer Harper's testimony that he usually takes eight to 12 minutes to write a citation. Burke argues that Harper instead detained him for 23 minutes, which included long periods of inactivity, superfluous conversation with other officers, and unnecessary record checks of Burke's juvenile history.

{¶ 24} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. * * * Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. *Accord State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.)

{¶ 25} "The Fourth Amendment imposes a reasonableness standard upon the exercise of discretion by government officials. * * * 'Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 11, quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that

intrusion.' " *Id.*, quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 26} In the specific context of traffic stops, motorists may be delayed for a sufficient time to let officers issue tickets or warnings. "This measure includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates." *Id.* To decide if these tasks were completed " 'within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Id.* at ¶ 12, quoting *State v. Carlson*, 102 Ohio App.3d 585, 588, 657 N.E.2d 591 (9th Dist.1995).

{¶ 27} "[A]n officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.' " *State v. Hall*, 2017-Ohio-2682, 90 N.E.3d 276, ¶ 13 (2d Dist.), quoting *Rodriguez v. United States*, 575 U.S. 357, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). However, "[a] police officer need not have a reasonable suspicion that a vehicle contains contraband prior to summoning a canine drug unit or conducting a canine free air sniff." *State v. Pack*, 2d Dist. Montgomery No. 28458, 2020-Ohio-5033, ¶ 27, citing *State v. Thomas*, 2d Dist. Montgomery No. 22833, 2009-Ohio-3520, ¶ 15.

{¶ 28} Contrary to the implication in Burke's brief, the stop's duration was not unreasonable simply because it exceeded the usual time for writing citations. As noted, a totality of circumstances approach is used, and officers should not be unduly restricted to a specific time period.

**{¶ 29}** Under the totality of the circumstances here, the stop's duration was reasonable. In addition to reading the transcript, we have reviewed the video, and we do not find that Officer Harper was dilatory. Furthermore, while Harper was able to obtain various information, Burke could never produce proof of insurance, even though Harper asked him twice for it. *See Rodriguez* at 255, quoting *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ("[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' * * * Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") *Accord State v. Ogletree*, 2d Dist. Montgomery No. 27767, 2018-Ohio-2327, ¶ 24. Officer Harper also had not finished writing the citation before the canine unit arrived. We therefore agree with the trial court that the officer did not unnecessarily extend the duration of the stop.

**{¶ 30}** Furthermore, " 'the detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop.' " *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 15, quoting *State v. Howard*, 12th Dist. Preble No. CA2006-02-002, 2006-Ohio-5656, ¶ 16. The State argued this point in the trial court, but the court did not use it as a basis for its decision. *See* July 9, 2021 Motion in Opposition to Defendant's Motion to Suppress, p. 5-6.

**{¶ 31}** As indicated, to justify intrusion upon an individual's freedom of movement,

a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. *See also State v. Bobo*, 37 Ohio St.3d 177, 178, 524 N.E.2d 489 (1988). "The 'reasonable and articulable suspicion' analysis is based on the *collection* of factors, not on the individual factors themselves." (Emphasis sic.) *Batchil* at ¶ 19, citing *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

{¶ 32} The collection of factors here included Officer Harper's observation of Burke's unusual nervousness. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Harper also recalled an encounter in 2019 with Burke that led to a weapons charge. In addition, Harper knew that Burke's friend had been involved in drug trafficking and had been killed. In fact, the video indicated that Burke's weapons charge was connected to that prior event, when Burke sought out someone suspected of the murder. State's Ex. 1 at 1:45: 25 – 34 and 1:52.

{¶ 33} Another circumstance was that Harper believed he smelled marijuana when he checked the license tag. While Harper later stated at the scene that he "got a faint odor but * * * couldn't be sure," all these facts combined provided a reasonable suspicion for extending the initial traffic stop until the canine unit arrived. While it is true that reasonable suspicion cannot be predicated solely on one's association with a person who has committed unlawful acts, this was not the only factor. In fact, Harper recalled his own recent experience with Burke and observations he made as a result of Burke's police

interview.

**{¶ 34}** Notably, the trial court specifically found Harper's testimony credible. Decision at p. 4. We defer to trial court decisions on credibility if they are supported by competent, credible evidence, since trial courts are in the best position to evaluate witnesses and assess credibility. *E.g., State v. Lancaster*, 2018-Ohio-315, 104 N.E.3d 951, ¶ 47 (2d Dist.). Here, the court's decision was supported by competent, credible evidence. Accordingly, the court did not err in finding that the stop's duration was reasonable and that Burke's constitutional rights were not violated.

**{¶ 35}** As a further point, the trial court also found probable cause for the automobile search because Officer Harper observed loose marijuana "shake" on Burke's clothing when he removed Burke from the car. Decision at p. 2 and 5. This occurred before Ox alerted to the marijuana. State's Ex. 1 at 1:53. As support for its decision, the trial court cited *State v. Greenwood*, 2d Dist. Montgomery No. 19820, 2004-Ohio-2737. Decision at p. 5.

**{¶ 36}** In *Greenwood*, we found that even if a defendant "had been detained longer than needed to complete the traffic stop in order to facilitate a drug sniff," the officer had reasonable suspicion for believing the vehicle contained drugs because he "actually saw marijuana seeds and leaves on the passenger seat and floorboard" when he approached the vehicle. *Id.* at ¶ 10. We therefore found no constitutional violation. *Id.* In addition, we found that the officer's observation "gave him probable cause to believe that the vehicle contained contraband." *Id.* at ¶ 11.

**{¶ 37}** Burke has not commented on this point in his brief. We note that Officer

Harper not only observed the shake, he also said he could smell marijuana right after he removed Burke from the car. R.C. 3796.06(A)(3) does allow possession of prescribed marijuana plant material. However, while a person holding a valid marijuana license can possess plant marijuana, regarding the "shake" on Burke's clothing, Ohio Adm.Code 3796:7-2-05(G)(2) requires medical marijuana to be maintained only in the containers approved in subsection (G). Ohio Adm.Code 3796:7-2-05(E) also requires that medical marijuana be kept in a "in a secure location so as to prevent theft, loss, or access by persons not authorized" to possess medical marijuana. Consequently, an officer could reasonably conclude that the marijuana was being illegally possessed when he observed shake all over Burke's shirt and clothing, even if it was legitimate medical marijuana. In addition, Harper had previously detected the odor of raw marijuana at the trunk of the car. Prior to Ox alerting, Burke admitted to Harper that he had smoked marijuana earlier in the evening. State's Ex. 1 at 1:54:03.

{¶ 38} Given these facts, we agree with the trial court that Burke had probable cause at that point to search the vehicle. At a minimum, this would have provided reasonable suspicion for extending the stop. *State v. Vega*, 154 Ohio St.3d 569, 2018-Ohio-4002, 116 N.E.3d 1262, ¶ 17 ("[w]hen an officer has reasonable suspicion of criminal activity, however, nothing in *Rodriguez*[, 575 U.S. 357, 135 S.Ct. 1609, 191 L.Ed.2d 492] limits his ability to prolong the stop for a reasonable time in order to conduct an investigation").

{¶ 39} Burke has advanced a second argument in support of suppressing evidence. This argument is based on the recent legalization of hemp, CBD oil and

medical marijuana. According to Burke, if a dog alerts to both legal and illegal substances in the same way, an alert would not reasonably reveal a fair probability of criminal activity. Burke points out (without accompanying evidence having been presented below) that prosecutors around the country have decided to no longer search vehicles based solely on the alert of a canine animal that is trained to detect THC. He also stresses that the Colorado Supreme Court has recently held that a canine alert does not constitute probable cause. *See* Appellant's Brief, p. 12, citing *People v. McKnight*, 2019 CO 36, 446 P.3d 397.

**{¶ 40}** The trial court rejected Burke's argument, noting first that it did not intend to legislate from the bench. Decision at p. 6. The court also found Burke's argument misplaced because Ox was trained to detect THC, while CBD oil, which is legal, does not contain this ingredient. *Id.* The court further observed that Burke did not make any claim during the traffic stop that he had a medical marijuana card, nor was any evidence presented to this effect during the hearing. *Id.*

**{¶ 41}** In view of the fact that Officer Harper had probable cause for the search before the dog sniff, due to his observation of marijuana shake and his perception of the odor of marijuana on Burke's person and at the car trunk, there is no need to consider Burke's second argument, and we decline to do so.

**{¶ 42}** Based on the preceding discussion, Burke's sole assignment of error is overruled.

III. Conclusion

{¶ 43} Burke's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
James C. Staton
Hon. Dennis J. Adkins